UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

THOMAS UHLIG,

Plaintiff,

v.  4:11-cv-145

DRAYPROP, LLC; DRAYPARK, LLC;
MICHAEL BROWN; REUBEN CROLL;
and MARLEY MANAGEMENT, INC.,

Defendants.

## ORDER

## I. INTRODUCTION

Thomas Uhlig made a bad bet and lost. But for Defendants' fraud, negligence, and misrepresentations related to asbestos abatement and construction timetables, Uhlig says he never would have made the bet. ECF No. 1-2 at 6-8. Defendants deny all Uhlig's allegations, arguing they fail as a matter of law. ECF No. 42. Defendants also move for summary judgment as to any damages they may be liable for, ECF No. 45, and to exclude the testimony of Steve Adams, an expert Uhlig wishes to present. ECF No. 48. Because the Court agrees with Defendants that no genuine disputes of fact exist as to liability, the Court *GRANTS* Defendants' motion for summary judgment. Defendants remaining motions regarding damages and Uhlig's expert witness are *DISMISSED AS MOOT*.

## II. BACKGROUND

1951 saw the opening of a high-rise condominium building in downtown Savannah, Georgia named Drayton Tower. ECF No. 62 at 2. Fast forward fifty four years and Defendant Drayprop, LLC became the owner of Drayton Tower. *Id.* Draypark, LLC owned and operated the tower's parking lots. ECF No. 61 at 3.

Drayprop's ownership consisted, at least in part, of two companies Reuben Croll belonged to and one of Michael Brown's. *Id.* at 3-4. Neither Croll nor Brown own stakes in Drayprop in their individual capacities. *Id.* Drayprop then hired Marley Management ("Marley") to manage the infrastructure renovations of Drayton Tower. *Id.* at 2. And at some point, Drayprop sold the fourth floor of Drayton Tower to Restore Savannah, LLC. ECF No. 40-1 at 8.

Enter Uhlig. Restore Savannah sold Uhlig two apartments on the fourth floor for $403,000. *Id.* at 135. The sales contract, to which only Restore Savannah and Uhlig were parties, stated that the "Property is being sold 'as is'," and that Restore Savannah had "no obligation to make repairs to Property." *Id.* at 138. The contract also made clear that no seller's property disclosure statement would be provided. *Id.* at 142.

Prior to signing the contract, Uhlig performed a walkthrough of the two apartments, ECF No. 62 at 2, and had access to (1) promotional materials composed by Croll and Drayprop, *id.* at 3; (2) construction plans, *id.*; and (3) historical materials about Drayton Tower. *Id.* At no point *prior to purchase* did any defendant speak to Uhlig about asbestos in Drayton Tower and Uhlig himself, despite knowing asbestos might be

present, made no inquiries or conducted any testing. ECF No. 62-4 at 6. Nor did any defendant represent to Uhlig prior to his purchase that renovations on Drayton Tower would be completed by a particular date. ECF No. 61 at 7-8. Only the construction plans, by reference to a letter from Darby Bank promising $1,500,000.00 in funds for renovations, contained an estimate of when renovation work would be complete. ECF No. 40-1 at 153.

That estimated deadline—March 1, 2006—came and went with much work on Drayton Tower unfinished. ECF No. 62 at 5. The discovery and abatement of asbestos further delayed renovations. *Id.* at 6. By the time Uhlig finished renovation work on his apartments and was ready to sell, the real estate market had soured. *Id.* at 7. Unable to sell, Uhlig decided to rent the apartments. ECF No. 62-4 at 10. Unfortunately for Uhlig, the rental income covered his mortgage payment, but not other costs associated with the apartments. *Id.* He later defaulted on his loan obligations as a result. *Id.*

Frustrated with the pace of renovations and what he felt were misrepresentations about the presence of asbestos and need for abatement, Uhlig filed this suit.[1] ECF No. 1-2. In his amended complaint he asserts claims for (1) negligent misrepresentation against all defendants[2]; (2) breach of contract, against Croll, Brown, and Drayprop; (3) negligence, against Croll, Brown, and Marley; and (4) fraudulent misrepresentation, against Croll, Brown, and Drayprop. *Id.* at 7-8.

After this Order sets forth the standard of review, the Court's discussion proceeds in two parts. First, the Court evaluates the claims against Croll and Brown. And second, the Court evaluates the claims against Drayprop and Marley.

### III. STANDARD OF REVIEW

"Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). All evidence and factual inferences, however, must be viewed "in the light most favorable to the non-moving party," and "all reasonable doubts" resolved in his favor. *Id.* Nevertheless, should the moving party meet its initial burden to point out the absence of evidence supporting an essential element on which the non-moving party bears the burden of proof, the non-moving party "must do more than simply show that there is some metaphysical doubt

---

[1] The winding procedural road that ends with the motions now before the Court is somewhat long and fraught with detours. Originally filed in state court, then removed, then remanded, which remand Uhlig successfully appealed, this case presents the Court with a standard motion for summary judgment based on state law claims. Although the parties are not diverse, jurisdiction remains proper because at the time of removal the FDIC was a party thus conferring original jurisdiction over all claims in the case, even those not involving the FDIC, and even after the FDIC's dismissal from the case. *See Lindley v. FDIC*, ___ F.3d ___, No. 12-12015, 2013 WL 4269389, at *10 (11th Cir. Aug. 16, 2013).

[2] Although Uhlig's complaint alleges that Draypark "failed to properly administer Plaintiff's interest in the parking facility," Uhlig has since abandoned all claims against Draypark. *See* ECF No. 61 at 12.

as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Croll and Brown

Uhlig asserts that Croll and Brown misrepresented that (1) Drayprop would complete renovations on Drayton Tower by March 1, 2006; and (2) Drayton Tower "had been tested and found to be asbestos free." ECF No. 1-2 at 6. Uhlig also asserts that Croll and Brown breached "the contracts that existed between [Uhlig] and Defendants Drayprop [and] Draypark." *Id.* at 7.

Uhlig believes Brown misrepresented that a "sewer line would be properly provided to each floor" of Drayton Tower, *id.* at 6, and that Brown "was negligent in the administration of the Drayton Tower renovations." *Id.* Croll, meanwhile, allegedly was negligent in performing an asbestos test and representing to Uhlig the condition of the building. *Id.* at 7.

Uhlig's Sisyphean task is to show that Brown and Croll acted as individuals, not as members of Drayprop. Otherwise, liability cannot attach to either man because "[a] member of a limited liability company is not a proper party to a proceeding . . . against a limited liability company, solely by reason of being a member of the limited liability company." *Yukon Partners, Inc. v. Lodge Keeper Group, Inc.*, 258 Ga. App. 1, 6 (2002) (quoting O.C.G.A. § 14-11-1107(j)).[3]

Plaintiffs like Uhlig wishing to pierce the LLC liability veil between a company and a member must go a step further and "show that the defendant disregarded the separateness of legal entities by comingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control." *Christopher v. Sinyard*, 313 Ga. App. 866, 867 (2012). Although the issue of veil piercing is typically for the jury to decide, summary judgment is appropriate if "there is no evidence sufficient to justify disregarding the corporate form." *Id.*

Much like Sisyphus, Uhlig fails, though not because he couldn't push his rock to the top of a hill. Instead, Uhlig presents no facts that suggest Drayprop served as the alter ego of Brown or Croll or that either man disregarded the separateness of legal entities. *Id.* To support his allegation that Brown and Croll "did not treat Drayprop . . . [as] a distinct legal entity separate from their personal business," Uhlig says that Brown and Croll (1) "were personally involved in creating the[] marketing and construction plan materials and having them passed along to potential buyers, including [Uhlig];" (2) created Drayprop "shortly before the purchase of Drayton Tower;" and (3) used other companies affliated with them to guarantee Drayprop's business loan agreement with Darby Bank. *Id.* at 9-10.

---

[3] Although not sitting in diversity jurisdiction, this Court still must apply the law of the forum state— here, Georgia—because the claims at issue arise under Georgia law, the majority of parties are Georgia residents, and neither federal constitutional nor statutory law is to the contrary. *Cf. Horowitch v. Diamond Aircraft Indus., Inc.*, 645 F.3d 1254, 1257 (11th Cir. 2011); *Burger King Corp. v. E-Z Eating, 41 Corp.*, 572 F.3d 1306, 1313 n.9 (11th Cir. 2009).

Even taken as true, the facts Uhlig proffers do not demonstrate a genuine dispute at to whether Brown and Croll acted on behalf of themselves instead of Drayprop. Of course employees and owners of Drayprop would be involved in producing marketing materials. If merely doing one's job exposed employees of corporations and LLCs to personal liability, the benefit of the corporate form would be ephemeral at best.

The timing of Drayprop's creation shows only that Drayprop's founding members intended it to purchase and own Drayton Tower. And Brown and Croll's use of other companies they own to guarantee the business loan from Darby Bank to Drayprop, absent additional, more sinister, facts, demonstrates only sophistication in structuring business transactions. *Id.* at 10.

Even taken all together, the facts Uhlig urges as supporting individual liability for Croll and Brown do not suggest they disregarded the corporate form, comingled assets, or "actively took part in producing tortious misrepresentations to [Uhlig]." *Id.* at 8. At bottom, Uhlig simply fails to put forth sufficient facts to sweep aside the "great caution" courts must use when disregarding the legal distinction between an LLC and its members. *Primary Invs., LLC v. Wee Tender Care III, Inc.*, 746 S.E.2d 823, 827 n.5 (Ga. Ct. App. 2013). The Court therefore *DISMISSES* all claims against Brown and Croll.

### B. Drayprop and Marley

This section discusses first the breach of contract claims against Drayprop and Marley and then Uhlig's misrepresentation claims against Drayprop.

#### *1. Breach of Contract*

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Norton v. Budget Rent A Car Sys. Inc.*, 307 Ga. App. 501, 502 (2010). "A breach occurs if a contracting party . . . fails to perform the engagement as specified in the contract . . . ." *UWork.com, Inc. v. Paragon Techs., Inc.*, 321 Ga. App. 584, 590 (2013). In other words, to assert a claim for breach of contract, the party against whom the claim is brought must have been a party to the contract. *Id.*

A contract, however, must exist before someone can breach it. At a minimum, valid contracts have four essential elements: (1) parties able to contract; (2) consideration; (3) agreement by the parties to the terms of the contract, the essence of which is a meeting of the minds; and (4) a subject matter on which the contract can operate. O.C.G.A. § 13-3-1.

Uhlig bases his breach claims "on the promises contained in the sales pamphlet, the Construction Plans, and the Darby Bank letter of May 20, 2005." ECF No. 62 at 15. Uhlig recognizes that the sales contract for the two units he purchased "was between [Uhlig] and Restore Savannah," but argues that Drayprop and Marley nevertheless "had substantial interests" in that sale taking place. *Id.* The Court reviews each set of documents—the pamphlet, the plans, the bank letter, and the sales contract—to

4

determine whether they, alone or in tandem, establish a contract between Uhlig and Drayprop or Marley. None of the documents do.

The sales pamphlet, although produced by Drayprop, does not constitute a contract. At best, it is an invitation to bargain. *See Georgian Co. v. Bloom*, 108 S.E. 813, 814 (Ga. Ct. App. 1921) (holding that advertisements generally are invitations to bargain and not offers). The pamphlet's first page reinforces that conclusion by referencing the *availability* of "partial or entire floors" for sale, and inviting interested parties to call Mopper Stapen Realtors "[f]or pricing, appointments and complete details of the Drayton Tower." ECF No. 40-1 at 88.

The construction plans, provided to Uhlig by a real estate agent, also do not a contract make because Drayprop and Marley never agreed with Uhlig to the terms in the plans. In fact, Drayprop and Marley never met with Uhlig to discuss the plans, much less come to agreement about them, prior to Uhlig's purchase of the apartments. *See* ECF 62-4 at 3 (Uhlig admitting that prior to his purchase he never spoke with any of the defendants). If the plans constitute part of a contract, it is not one between Drayprop or Marley and Uhlig.

The Darby Bank letter similarly cannot constitute a contract between Drayprop or Marley and Uhlig. Neither Drayprop nor Marley ever came to an agreement with Uhlig about the timeline for completion of renovations in the letter, which Restore Savannah and Mopper Stapen provided to Uhlig. For the same reason, the pamphlet, construction plans, and letter taken together do not create a contract between Drayprop or Marley and Uhlig. Drayprop and Marley simply never had any agreement with Uhlig about renovations or anything else.

The only possible contract here existed between Uhlig and Restore Savannah, a non-party to this litigation. *See* ECF No. 40-1 at 141. But because a non-party to a contract cannot breach that contract, *see UWork.com, Inc.*, 321 Ga. App. at 590, Uhlig cannot assert a breach claim against Drayprop or Marley based on the Uhlig-Restore Savannah purchase agreement.

None of the documents Uhlig cites as establishing a contract between him and Drayprop or Marley do so. Uhlig's breach of contract claims therefore fail as a matter of law.

### 1. Misrepresentation Claims

Uhlig asserts that Drayprop made several misrepresentations, some negligently, others with fraudulent intent. *See* ECF No. 1-2 at 5-6, 8. Uhlig claims Drayprop negligently represented that (1) infrastructure renovations would be completed by March 1, 2006; (2) window frames would be polished; (3) the sewer line would be properly provided to each floor; and (4) Drayton Tower had been tested and found free of asbestos. *Id.* at 6. Uhlig also claims that Drayprop "engaged in a scheme to misrepresent that Drayton Tower was free from environmental hazards when in fact it was not." *Id.* at 8. The Court first addresses Uhlig's negligent misrepresentation claims.

a. Negligent Misrepresentation

"The essential elements of negligent misrepresentation are (1) the defendant's

*negligent* supply of false information to foreseeable persons . . . (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." *Hendon Props., LLC v. Cinema Dev., LLC*, 275 Ga. App. 434, 439 (2005) (emphasis added). Although Uhlig makes the conclusory allegation that Drayprop "knew or should have known" its representations "were false," he offers no facts, nor presents any evidence, to support that assertion.

The failure of Uhlig's claims is best highlighted by asking the question: assuming falsity, why should Drayprop have known its representations were false? After examining the record, the Court cannot begin to answer that question. The closest Uhlig comes to an explanation is his statement that the "extremely wide gap between what was promised and what was delivered strongly implies that [Drayprop] knew, at the time the representations were made, that at least some portion of the promised work would not be performed by the specified date." ECF No. 62 at 14.

But saying that does not make it so. Uhlig goes to great lengths to show the falsity of Drayprop's representations—particularly the timeline for completion of renovations—but it nevertheless remains the case that Uhlig offers nothing more than conclusory allegations to support his assertion of *negligent* misrepresentation. In fact, Uhlig admitted that none of the information in the construction plans, sales pamphlet, or the Drayton Tower historical documents was "wrong," much less that Drayprop should have known it was wrong. ECF No. 62-4 at 5. Because Uhlig fails to demonstrate that Drayprop should have known its representations were false, Uhlig's negligent misrepresentation claims fail as a matter of law.

b. Fraudulent Mispresentation

Fraudulent misrepresentation has five elements. Uhlig must show that (1) Drayprop made false representations; (2) Drayprop knew the representations were false at the time they were made; (3) Drayprop made the representations intending to deceive Uhlig and induce him to rely on the representations; (4) Uhlig justifiably relied on the representations; and (5) the representations resulted in damages to Uhlig. *See Grand Master Contracting, L.L.C. v. Lincoln Apartment Mgmt. Ltd. P'ship*, 314 Ga. App. 449, 451 (2012).

Uhlig fails to present any evidence on multiple elements of a fraudulent misrepresentation claim. First, he offers no facts showing that Drayprop knew its representations were false. He merely asks the Court to infer that because so many renovations remain unfinished Drayprop must have known "that at least some portion of the promised work would not be performed by the specified date." ECF No. 62 at 14.

Second, Uhlig offers nothing to show that Drayprop made any representation intending to deceive Uhlig. And finally, Uhlig fails to show justified reliance. As with the knowledge element, Uhlig simply offers no facts relevant to the justifiability of his reliance on Drayprop's representations. A failure on any of these elements would submarine Uhlig's fraudulent misrepresentation claim. A failure on three

6

elements torpedoes it beyond a shadow of a doubt.

## V. CONCLUSION

Uhlig's claims against Brown and Croll fail because Uhlig cannot show that either man acted as an individual, not on behalf of one of a number of LLCs. Uhlig's claims against Drayprop and Marley also fail, this time because for each claim—breach of contract, negligent misrepresentation, and fraudulent misrepresentation—Uhlig lacks any evidence supporting at least one essential element.

Because all of Uhlig's claims fail as a matter of law, the Court ***GRANTS*** Defendants' motion for summary judgment. Defendants' motion for summary judgment as to damages and motion to exclude expert testimony are ***DISMISSED AS MOOT***. The Clerk is ***DIRECTED*** to (1) terminate ECF Nos. 41, 47, and 50, and (2) close this case.

This 4 day of October 2013.

_____
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA